# IN THE SUPREME COURT OF IOWA

No. 20–1319

Submitted January 20, 2021—Filed April 2, 2021

**IN THE INTEREST OF W.M.** and **W.D.,**
Minor Children,

**S.C.,** Mother, **STATE OF IOWA,** and **W.B.,** Father,

Appellants.

---

Appeal from the Iowa District Court for Jackson County, Phillip J. Tabor, District Associate Judge.

The State appeals denial of its petition to terminate a mother's parental rights. The mother appeals appointment of a guardian for the children. One father appeals termination of his parental rights. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Oxley, J., delivered the opinion of the court, in which Christensen, C.J., and Appel, Waterman, and Mansfield, JJ., joined. McDermott, J., filed an opinion concurring in part and dissenting in part in which McDonald, J., joined.

Stuart G. Hoover of Alliance Law Firm, PC, Dubuque, for appellant mother.

Thomas J. Miller, Attorney General, Mary A. Triick, Assistant Attorney General, and Sara Davenport, County Attorney, for appellant State.

Joshua J. Reicks of Schoenthaler, Bartelt, Kahler & Reicks, Maquoketa, for appellant father.

**OXLEY, Justice.**

In this case, the juvenile court terminated the parental rights of both of the fathers of two children but denied the State's petition to terminate the mother's parental rights. Instead, the court entered a permanency order appointing the paternal grandmother of one of the boys as the guardian for both. Mom appeals the permanency order, asking us to reverse the appointment of the grandmother as guardian and directing the State to continue reunification efforts. The State also appeals the termination order, arguing Mom's parental rights should have been terminated. Thus, neither the State nor Mom supports the juvenile court's resolution of the case with respect to Mom.

One father has also appealed termination of his rights, but his notice of appeal was untimely filed. We therefore must first determine whether he is entitled to a delayed appeal before addressing the merits of the father's termination.

**I. Factual Background and Proceedings.**

Mom has struggled with addiction to methamphetamine. She has sought treatment, but she has relapsed many times over. The two children involved in this case are W.M. and W.D., who have different fathers. At the start of this case, W.M. was seven and W.D. was three. W.M. was involved in a prior child-in-need-of-assistance (CINA) proceeding where he was removed from Mom's care but ultimately returned to her custody. W.M.'s father has not appealed the termination of his parental rights. W.D's father appealed, but the notice of appeal was filed two days late. We will refer to W.D.'s father as "Dad."

This case was brought to the department of human service (DHS)'s attention in August 2018 when Mom's paramour (neither of the children's fathers) abused Mom in front of her sons. There were also concerns about

Mom's use of illegal substances, particularly methamphetamine. Mom was living with her paramour and the children in Maquoketa, and, following the assault and DHS intervention, she became homeless. She stayed with family and friends during this time period. She found housing at the Theresa House in Dubuque, but she was asked to leave the shelter house due to concerns about substance abuse.

DHS placed the children in the custody of their respective paternal grandparents, and Mom moved from town to town. After her mother helped her get a hotel room, Mom left behind drug paraphernalia in the room. A caseworker found shelter housing for Mom, and Mom entered a residential substance abuse treatment program at High Tower on September 21, 2018.

Once in inpatient treatment, Mom did well. She worked toward sobriety, and it appeared she was dedicated to remaining clean. She had visitations with the children where workers helped her learn parenting skills, particularly follow-through on discipline. W.M. exhibited many behavioral problems throughout the visits, and his paternal grandmother reported his behavioral problems increased directly in correlation to visits with Mom. Notably, W.M. has lived with his paternal grandparents on and off since he was three years old, long before DHS became involved in this proceeding. He had issues with bedwetting that his grandparents attributed to his past living situation. The bedwetting improved when W.M. was living with his grandparents, but it increased or resumed when W.M. saw or spoke to Mom. W.D. exhibited some behavioral problems, primarily centered on hyperactivity and not listening. However, he did not exhibit the same concerns directly tied to seeing Mom as W.M.

DHS returned W.D. to Mom's care at High Tower after W.D. tested positive for methamphetamine while in his paternal grandparents' care.

Mom had a negative hair test for substances in the same time period. W.M. continued to have visits with Mom but often acted out throughout those visits.

While Mom stayed in the highly-structured High Tower setting, she continued to do well in her personal life and with respect to the children, although there was concern that she contacted the abusive ex-paramour despite a no-contact order. DHS worked with her and emphasized the importance of respecting the no-contact order. W.M. was placed back in her care on January 24, 2019, while Mom continued to participate in inpatient care.

Around February 12, Mom used marijuana outside the presence of the children. She reported this to her caseworker promptly and looked into modifying her medications, which she believed were not working. Mom found a job, but her hours interfered with seeing the children, so she quit.

Mom successfully completed the substance abuse programing at High Tower in April. Unfortunately, shortly thereafter, she relapsed and the children were again removed from her care. W.M. returned to the care of his paternal grandparents, and W.D. was placed in foster care.

Throughout the summer of 2019, Mom had visitation with the children at the maternal grandmother's house, where Mom was living. Mom provided a negative sweat patch for several illegal substances in August, and she reengaged with services and again worked toward bettering herself and getting her children back. In September, Mom was permitted overnight visits with W.D. and extended visits with W.M.

However, in October, Mom started avoiding her caseworkers. On October 10, the worker met with Mom, and she admitted to yet another relapse with methamphetamine and marijuana. The worker asked Mom

to undergo drug testing throughout October, November, and December, which she repeatedly failed to do. When Mom finally provided a sample on December 23, she tested positive for amphetamines, methamphetamine, and THC. The caseworkers urged Mom to return to inpatient treatment; the maternal grandmother gave Mom an ultimatum to either seek treatment or move out. In response, Mom requested visits no longer take place at her mother's house. Mom continued to have semisupervised visits overseen by her mother on weekends.

In January 2020, W.M.'s paternal grandmother reported that W.M.'s therapist had recommended he stop seeing Mom. W.M. increasingly began refusing to go to visits, sometimes agreeing to go after being convinced by caseworkers but other times stating he was only going to see his brother.

Mom struggled with disciplining the children. During one visit, W.M. acted out by throwing snow at Mom and W.D. Mom resorted to yelling and swearing at W.M. and then threatened to call the police if W.M. did not listen. The children reported Mom sometimes slept during interactions. W.M. also started wetting his pants surrounding his visits with Mom. W.M.'s paternal grandparents pushed for termination of Mom's parental rights so they could adopt him.

Shortly thereafter, Mom checked herself into inpatient treatment at Prairie Ridge. Following her time in Prairie Ridge, Mom returned to High Tower on February 24. Once again, Mom began engaging in treatment and working toward sobriety. However, her caseworker expressed concerns, noting Mom had been in treatment many times before and admitted she only went to Prairie Ridge to avoid going to prison. Mom also had a new paramour at this time who had a history of substance abuse.

Nonetheless, Mom excelled at High Tower, and her counselor reported that it seemed she was more committed to remaining clean this

time. Due to the difficulties of administering services while complying with the social and physical distancing requirements caused by the COVID-19 pandemic, W.D. was placed back with Mom at High Tower, while W.M. remained with his paternal grandparents. Visits with W.M. were conducted by videoconference, which he struggled with. W.M.'s paternal grandmother reported that he wanted to remain permanently with his grandparents, not return to Mom's care. His paternal grandmother reported that during a recent trip to Maquoketa, where W.M. had previously lived with Mom when she was using drugs, W.M. told his grandparents about times when he had to sleep in the alleys of Maquoketa. She believed he had been traumatized and still struggled to speak about it.

Mom completed treatment at High Tower again and moved into her own apartment in July. After she moved into her apartment, she stopped attending drug counseling. Additionally, Mom began associating with people who had criminal and substance abuse histories and allowed them to be around W.D. Mom admitted she stopped taking her medications and stopped attending therapy. Rather than use the approved daycare arranged by DHS, Mom allowed an unapproved male friend with a history of domestic violence to babysit W.D. when she was at work. Mom tested positive for methamphetamines and THC in early August. W.D. was once again removed from her care and was placed with W.M. at W.M's paternal grandparents' home. The grandparents expressed an intention to adopt both boys if Mom's parental rights were terminated.

At this time, the caseworker noted Mom did not understand why W.D. had to be removed from her care. The worker observed that Mom did "not appear to see how her actions have affected [W.D.] and his safety. She [did] not appear to have the capability of making long term safe choices."

Dad spent most of this case incarcerated or in halfway houses. Despite expressing an interest in participating in the case in September 2018, Dad did not follow through. Case notes between October 2018 and February 2019 consistently indicate Dad had only minimal participation in services, so the worker could not assess his parenting capabilities. In March, Dad was arrested and jailed.

Following his release from jail in April 2019, Dad contacted caseworkers and had two positive interactions with W.D. in May. However, Dad relapsed in late May and returned to jail. No interactions were reported in July, August, September, or October.

Dad was residing at the Elm Street Facility, a residential corrections facility (RCF), but absconded on November 21, 2019, and was picked up on new charges on December 4. He remained incarcerated throughout the following months, where caseworkers encouraged him to take advantage of offered classes. He was released on May 13, 2020, and again resided in an RCF. Dad failed to respond to communications from DHS workers, who later learned he had again absconded from the RCF and a warrant had been issued for his arrest. The last contact Dad had with W.D. was in late 2019.

On August 21, 2020, the State moved to terminate parental rights to all parents pursuant to Iowa Code sections 232.116(1)(*f*) and 232.116(1)(*l*) (2020). The guardian ad litem (GAL) supported termination of all parents' rights. After a hearing, the court concluded the State had proven the grounds for termination and terminated the rights to both fathers under Iowa Code section 232.116(*f*). However, the court did not terminate Mom's parental rights, concluding the bond between Mom and both boys precluded termination. Instead, the court entered a permanency order placing W.M. and W.D. in a guardianship with W.M.'s

paternal grandmother pursuant to Iowa Code section 232.104(2)(*d*)(1). It clarified that the guardianship was a "Juvenile Court guardianship"[1] and provided that DHS was relieved from providing further services, but requested both DHS and the GAL provide annual reports to the court as part of the guardianship proceedings.

The State appealed, arguing the court should have terminated Mom's parental rights. In the alternative, the State seeks relief from the court's permanency order imposing annual reporting obligations on DHS. Because we reverse the imposition of the guardianship, we do not address the reporting requirements.

Mom also appealed, arguing the court should have ordered continued efforts toward reunification with Mom rather than appoint the grandmother as guardian and relieve DHS of providing further services.

Dad filed an untimely notice of appeal. The court entered the termination order on September 28, 2020, so the notice of appeal was due October 13. Iowa R. App. P. 6.101(1)(*a*). Dad's notice of appeal was filed on October 15 along with a motion for relief from filing deadline. Dad's attorney explained that the notice of appeal was late because he sent the termination order and a notice of appeal for Dad's signature to the Iowa Medical and Classification Center, but Dad had been transferred to a correctional facility in the interim. The attorney filed the notice of appeal the same day he received the signed copy back from Dad, but he ascribes the delay to the amount of time it took for the letter he sent to the medical facility to be redirected.

W.M.'s father did not appeal termination of his parental rights with W.M., who was placed with the father's parents.

---

[1] We take this to mean a Chapter 232D guardianship. *See* Iowa Code § 232.104(8)(*b*).

## II. Standard of Review.

We review termination of parental rights de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). We are not bound by the factual findings of the juvenile court, though we give them respectful consideration, particularly with respect to credibility determinations. *Id.*

The State must prove termination was proper by clear and convincing evidence. *Id.* "Evidence is considered clear and convincing 'when there are no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." ' " *Id.* (alteration in original) (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)). "[O]nce the State has proven a ground for termination, the parent resisting termination bears the burden to establish an exception to termination" identified in Iowa Code section 232.116(3). *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018).

## III. Analysis.

We must address three issues in this case: (1) whether the juvenile court erred in denying termination of Mom's parental rights or in placing the children in a guardianship with W.M.'s paternal grandmother, (2) whether to grant Dad's request for a delayed appeal, and, if we grant that request, (3) whether the juvenile court erred in terminating Dad's parental rights.

The State alleged termination of parental rights was proper for all three parents on the basis of Iowa Code section 232.116(1)(*f*), which requires the state to prove:

> (1) The child is four years of age or older.

> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

(3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The State also alleged termination was proper under Iowa Code section 232.116(1)(*l*), which requires the State to prove:

(1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102.

(2) The parent has a severe substance-related disorder and presents a danger to self or others as evidenced by prior acts.

(3) There is clear and convincing evidence that the parent's prognosis indicates that the child will not be able to be returned to the custody of the parent within a reasonable period of time considering the child's age and need for a permanent home.

"Our review of termination of parental rights under Iowa Code chapter 232 is a three-step analysis." *In re M.W.*, 876 N.W.2d at 219. First, we determine "whether any ground for termination under section 232.116(1) has been established." *Id.* If we conclude affirmatively, we next "determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights." *Id.* at 219–20. If we conclude section 232.116(2) supports termination, "we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights." *Id.* at 220.

**A. Mom's Parental Rights.** The reason DHS petitioned to terminate Mom's parental rights is clear on this record. Throughout this case, Mom engaged in a cycle of abusing drugs, getting clean, relapsing,

seeking treatment, and again abusing drugs. When she was using, Mom exposed her children to dangerous people and dangerous situations.

We conclude the State proved grounds for termination of Mom's parental rights under Iowa Code section 232.116(1)(*f*), so we do not address the second ground under section 232.116(1)(*l*). *See In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012) ("When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record.").

As to whether the children could be safely returned to Mom's custody, we note the children were returned to Mom's custody only to be removed again multiple times (twice for W.M., three times for W.D.) throughout this case, each time shortly after Mom's release from a treatment center. While Mom was in the supervised structure of inpatient treatment, she capably cared for her children. However, once she left treatment, Mom quickly returned to old habits, including contact with dangerous people and relapse to illegal drug use. Although the record does not reveal she used in the presence of her children, her use had a direct impact on her ability to safely parent the children, evidenced by increasingly erratic behavior when she relapsed and a lack of understanding of how her actions affected her children. A long history of substance abuse, repeated relapses, and demonstrated inability to maintain sobriety outside a supervised setting demonstrates the children could not have been returned to her care at the time of the termination hearing. *See In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998) ("Where the parent has been unable to rise above the addiction and experience sustained sobriety in a noncustodial setting, and establish the essential support system to maintain sobriety, there is little hope of success in parenting.").

We next consider whether termination is in the best interests of the children under section 232.116(2). *In re M.W.*, 876 N.W.2d at 224.

> When we consider whether parental rights should be terminated, we "shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." . . . For integration, we look at how long the children have been living with the foster family, how continuity would affect the children, and the preference of the children if they are capable of expressing a preference. Last, we may also consider statements of foster parents or relatives with whom the children have been placed.

*Id.* (quoting Iowa Code § 232.116(2)). Additionally, in evaluating the children's best interests we note

> [i]t is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child.

*Id.* (alteration in original) (quoting *In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014)). Finally, it is usually in the best interests of siblings to remain together. *In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982) ("Wherever possible brothers and sisters should be kept together . . . ."); *see also* Iowa Code § 232.108(1).

We conclude termination of Mom's parental rights is in the best interests of the children. W.M. has been traumatized and, seemingly, does not feel safe with Mom. While W.D. may not bear emotional scars to the same extent, repeatedly bouncing in and out of Mom's chaotic life cannot be healthy for him, either. Continuing to place W.D. with Mom only to be removed again is harmful to his need for permanency.

W.M. has been well cared for by his paternal grandparents, who have worked to keep him safe. They have responded to his needs and expressed genuine concern about him throughout this case. W.M. has

lived with his grandparents on and off since he was three years old, and his behaviors improve while he is with them. They have wanted to adopt him for some time.

W.D. was also placed with his brother's paternal grandparents not long before the termination hearing, so there is little in the record as to how he has adjusted to living with them. However, the grandparents have agreed to adopt W.D., keeping the brothers together. It is clear the brothers have a significant bond.

This is exactly the sort of case where we must not deprive a child of permanency on the hope Mom will get better. Mom clearly loves her children. Yet, we cannot deprive these children of a stable home on the hope that Mom will someday be able to succeed in her efforts to remain sober. We conclude termination is in the best interests of both children.

Finally, we must "determine whether any exceptions in section 232.116(3) apply to preclude the termination." *In re M.W.*, 876 N.W.2d at 225. Despite finding the State proved grounds for termination, the juvenile court concluded termination would be detrimental to the children based on the closeness of the parent–child relationship, a statutory exception to termination. *See* Iowa Code § 232.116(3)(*c*). The juvenile court concluded a guardianship with W.M.'s paternal grandmother for both children was preferable to termination.

Neither Mom nor the State seems content with that resolution; indeed, Mom appeals appointment of the guardian.[2] In any event, as we

_____

[2]It is not entirely clear who initially advocated for a guardianship as an alternative permanency plan. Counsel for Dad is the only one who asked about a guardianship during the hearing. In response to his questions, both of the social workers testified additional time under a guardianship was not preferable to termination given the length of time the boys had been involved with DHS and their needs for permanency. While the mother later testified in response to Dad's counsel's question that a guardianship would be preferable to termination, notably her own counsel did not ask her the same question.

have said before, "a guardianship is not a legally preferable alternative to termination." *In re A.S.*, 906 N.W.2d at 477 (quoting *In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017)). There are some instances where a guardianship may be appropriate, where, for example, "the mother and the [maternal] Grandmother have a close, mature, and healthy relationship that is free of conflict" and it is "evident the mother and the Grandmother can work together in the best interests of the child." *In re B.T.*, 894 N.W.2d at 34.

That does not appear to be the case here. The juvenile court ordered a long-term guardianship under Chapter 232D and relieved DHS "of any further services." Thus, Mom would not receive the benefit of additional services but would remain the parent of children who are under the guardianship of W.M.'s paternal grandmother. While the grandmother has indicated she will allow the children to see Mom if she is sober, the grandmother also supported termination of Mom's parental rights. Mom would also be allowed to challenge the guardianship, *see* Iowa Code § 232D.503(3), further complicating that relationship.

Having concluded the guardianship was not a proper permanency plan, we consider whether the juvenile court properly denied termination based on "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent–child relationship." Iowa Code § 232.116(3)(*c*). We do not discount that there is a bond between Mom and both boys. But Mom has failed to

---

The mother's counsel argued in closing that reunification services should be continued, noting he would "agree with what [Dad] is about to say," that if some type of permanency decision needed to be made, a guardianship was preferable to termination of the mother's parental rights. Despite the suggestion of a guardianship at the hearing, the GAL continued to recommend termination.

provide the clear and convincing evidence necessary to show that, on balance, that bond makes termination more detrimental than not.

Throughout this case, W.M. had increased behavioral problems in direct correlation to interactions with Mom. Time spent with her made him more defiant, and he wet the bed or his pants in relation to visits with Mom. He described trauma from his time in her care, and his therapist reportedly recommended he stop seeing Mom. He is well adjusted living with his grandparents.

While W.D. has a closer relationship with Mom, the bond is not so strong that it clearly outweighs his need for permanency. W.D. was almost six years old at the time of the hearing and had been removed from Mom's care three times in the prior two years. He clearly loves Mom and is glad to see her, but the evidence showed he did not ask for her when she was not around. Moreover, "[w]e gain insight into the child's prospects by reviewing evidence of the parent's past performance—for it may be indicative of the parent's future capabilities." *In re D.W.*, 791 N.W.2d at 709 (alteration in original) (quoting *In re M.S.*, 519 N.W.2d 398, 400 (Iowa 1994)). Mom has shown a pattern of behavior in the past that indicates how she will act in the future. We do not disagree with the court's observation "that the bond and the knowledge of the boys with their mother is going to be a lifetime relationship and that a simple termination order will not change this life bond." But that does make termination improper here. *See In re A.B.*, 815 N.W.2d at 778 n.8 ("[W]e concur in the juvenile court's view that there is a bond between [the father] and A.B. and S.B., but the children's safety, long-term nurturing and growth, and physical, mental, and emotional needs would be better served by termination of parental rights notwithstanding that bond."); *In re D.W.*, 791 N.W.2d at 709 (analyzing this exception and explaining "our

consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs").

We conclude that Mom's parental rights should be terminated and thus reverse the juvenile court's judgment.

**B. Delayed Appeal.** We addressed whether to extend the delayed appeal process we have recognized in criminal cases to termination-of-parental-rights cases in *In re A.B.*, ___ N.W.2d ___, ___ (Iowa 2021), also filed today. As noted there, the significant liberty interests at stake when a parent's rights are terminated support recognizing delayed appeals in the limited context in which we have allowed them in criminal cases. *Id.* at ___.

While there are some differences between the procedural problems in this case and *In re A.B.*, the same reasoning applies. Although the father in *In re A.B.* filed a timely notice of appeal, he missed the deadline for filing his petition on appeal. *Id.* at ___. In the context of Chapter 232 cases, our rules provide that a timely petition on appeal is required to properly perfect the appeal. *See* Iowa R. App. P. 6.102(*b*) ("An appeal in a [Chapter 232] case will be dismissed unless a petition on appeal is timely filed . . . ."); *id.* r. 6.201(1)(*b*) ("The time for filing a petition on appeal shall not be extended."); *id.* r. 6.201(3) ("If the petition on appeal is not filed . . . within 15 days . . . , the supreme court shall dismiss the appeal . . . ."). Here, Dad filed his notice of appeal two days late, but his petition on appeal was timely filed. We do not find the distinction between a late notice of appeal and a late petition on appeal material to whether a delayed appeal should be considered. Delayed appeals are an exception to our jurisdictional rules. *See In re A.B.*, ___ N.W.2d at ___ n.2; *State v. Anderson*, 308 N.W.2d

42, 46 (Iowa 1981) (recognizing delayed appeal may be allowed despite an untimely notice of appeal).

As explained in *In re A.B.*, we will consider a delayed appeal "only where the parent clearly intended to appeal and the failure to timely perfect the appeal was outside of the parent's control." ___ N.W.2d at ___. Even then, we still consider the timing of the appeal and will not allow a delayed appeal to prolong the appeal process. *Id.* The delay must be "no more than negligible." *Id.* Applying those criteria here, we grant Dad's request for a delayed appeal. Dad's attorney was apparently only able to communicate with Dad by U.S. postal mail and sent the termination order and a notice of appeal form to Dad to be signed at the Iowa Medical and Classification Center on September 29, the day after the order was filed. Counsel received the signed notice of appeal back from Dad on October 15 with a return address from the Fort Dodge Correctional Facility, not the Classification Center where it was originally mailed, with an October 13 postmark, the deadline for filing the notice of appeal. While it is unclear whether counsel attempted to obtain Dad's consent to use the modified signature requirements allowed under our COVID-19 supervisory order, what is clear is that Dad would not have known about the order until receiving it from his attorney. The notice of appeal was filed two days after the fifteen-day deadline, and the petition on appeal was filed on October 28, so that the petition was filed thirty days after the termination order.

Given the limited communication capabilities, we conclude Dad clearly intended to timely appeal and the late filing was beyond his control. The timing did not delay the appeal process. We therefore proceed to address whether the juvenile court properly terminated Dad's parental rights.

**C. Termination of Dad's Parental Rights.** In deciding whether it was proper for the court to terminate Dad's parental rights, we follow the same analysis we did for Mom. The juvenile court terminated Dad's parental rights pursuant to Iowa Code sections 232.116(*f*), concluding W.D. could not be returned to Dad's care and custody at the time of trial.

Dad does not dispute that W.D. cannot be returned to his care, as he is currently incarcerated. He argues, however, that his parental rights should not have been terminated because W.D. was placed in a guardianship. He also argues that he is scheduled to be released soon and he should have been given an additional six months to work toward reunification. *See* Iowa Code § 232.104(2)(*b*). We reject both arguments.

Our conclusion that the juvenile court erred by placing the boys in a guardianship as an alternative to terminating Mom's rights defeats his first argument. With respect to additional time toward reunification, Dad greatly overstates his involvement in W.D.'s life. He participated in two supervised visitations during the two-year history of this case and a handful of phone calls from jail. Although he had positive interactions during those visitations, he failed to take advantage of services offered to him throughout, limiting the caseworkers' ability to even evaluate his parenting capabilities.

The record also fails to demonstrate he has the stability to care for a child. On multiple occasions, Dad was jailed, released to an RCF, and absconded from the RCF, resulting in rearrest and further confinement. He continued to get into legal trouble and took no responsibility for his conduct. DHS workers noted W.D. and his father do not have a functional bond due to Dad's absence from W.D.'s life. We therefore affirm the judgment of the juvenile court terminating Dad's parental rights to W.D.

**IV. Conclusion.**

We reverse the juvenile court's determination as to Mom and affirm as to Dad. The case is remanded for entry of an order terminating Mom's parental rights to both W.M. and W.D. and further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Christensen, C.J., and Appel, Waterman, and Mansfield, JJ., join this opinion. McDermott, J., files an opinion concurring in part and dissenting in part in which McDonald, J., joins.

**McDERMOTT, Justice (concurring in part and dissenting in part).**

I concur in the majority's opinion as to the mother's appeal and remanding for termination of the mother's parental rights. But I respectfully dissent from the majority's grant of the untimely appeal by W.D.'s father and would dismiss his appeal for lack of jurisdiction for the reasons stated in my concurrence in part and dissent in part in *In re A.B.*, ___ N.W.2d ___, at ___ (Iowa 2021). W.D.'s father admits he failed to file his notice of appeal within the deadline as required by Iowa Rule of Appellate Procedure 6.101. Appeal deadlines are "mandatory and jurisdictional." *Root v. Toney*, 841 N.W.2d 83, 87 (Iowa 2013); *Lundberg v. Lundberg*, 169 N.W.2d 815, 817 (Iowa 1969). We lack jurisdiction to hear W.D.'s father's appeal and should dismiss it without reaching the merits of his argument. *In re J.H.*, 952 N.W.2d 157, 165 (Iowa 2020) (dismissing terminated mother's appeal "because it was untimely").

McDonald, J., joins this concurrence in part and dissent in part.